ORIGINAL
D & F
C/M

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

JOSEPHINE TESTA,

                Plaintiff,

    -against-

HARTFORD LIFE INSURANCE
COMPANY and MARSH & MCLENNAN
COMPANIES, INC.,

                Defendants.

-----------------------------------------------------------x

**MEMORANDUM AND ORDER**
Case No. 08-CV-816 (FB) (RER)

*Appearances:*
*For the Plaintiff:*
JUSTIN C. FRANKEL
JASON A. NEWFIELD
Frankel & Newfield P.C.
585 Stewart Avenue, Suite 301
Garden City, NY 11530

*For the Defendant Hartford Life Insurance Company:*
KEVIN G. HORBATIUK
Russo, Keane & Toner, LLP
33 Whitehall Street, 16th Floor
New York, NY 10004

*For the Defendant Marsh & McLennan Companies, Inc.:*
MICHAEL J. DELL
Kramer, Levin, Naftalis, & Frankel LLP
919 Third Avenue
New York, NY 10022

**BLOCK, Senior District Judge:**

       Josephine Testa ("Testa"), a fifty-two-year-old payroll supervisor, brings this

suit against her employer, Marsh & McLellan Companies, Inc. ("MMC"), and the claims

administrator of her long term disability insurance plan, Hartford Life Insurance Company

("Hartford"), under the Employee Retirement Income Security Act ("ERISA") "to recover

benefits due to [her] under the terms of [her] plan . . . ." 29 U.S.C. § 1132(a)(1)(B).

Hartford initially approved Testa's application for benefits. After Testa had received benefits for twenty-seven months, Hartford determined that she was no longer totally disabled and terminated her benefits. Hartford's termination decision was upheld on internal appeal; this suit followed.

Testa argues that Hartford was influenced by a conflict of interest, its decision was not supported by substantial evidence, and it did not engage in a full and fair review of her claim; in sum, she argues, Hartford's decision was arbitrary and capricious. Hartford and MMC disagree in all respects. All parties have moved for summary judgment. The Court held oral argument on February 16, 2011. For the reasons that follow, Hartford's and MMC's motions are granted.

## BACKGROUND

Testa was covered under MMC's Basic Long Term Disability Plan and Optional Long Term Disability Plan (the "plans").[1] The plans defined "total disability" and "totally disabled" as:

> [F]or the Qualifying Period and the next twenty-four months of any continuous period for which benefits are paid from this Plan, the complete inability of an Employee to perform any and every duty of his/her regular occupation. After benefits have been paid from this Plan for a continuous period of twenty-four months, thereafter Total Disability shall mean the complete inability of an Employee to engage in duties of any substantial gainful employment for which he/she is or may have been reasonably qualified by training, education or experience.

---

[1] The facts are drawn from the Administrative Record ("AR").

AR at Hartford 819, 841. Thus, for the first twenty-four months, Hartford applied what is commonly referred to as the "own occupation" standard; after twenty-four months, Hartford applied the stricter "any occupation" standard. MMC paid all benefits under the plans, and was bound by Hartford's determinations.

## A. Initial Application for Benefits

In August 2004, Testa stopped working due to severe migraine headaches, and in February 2005 she applied for benefits claiming that she suffered from migraine headaches and depression. Hartford approved Testa's application in March 2005, finding that she was eligible for benefits dating from February 2005 because she met the "own occupation" standard for total disability. In addition, Hartford referred Testa to a law firm and offered to give her a credit to cover legal fees in connection with her application for Social Security disability benefits; in September 2006, Social Security awarded Testa benefits. Social Security's determination was sent to Hartford, and became part of her file.

## B. Application for Continuing Benefits

Toward the end of the twenty-four month period during which the "own occupation" standard applied, Hartford asked Testa and her doctors to complete various forms to help it determine whether she would continue to receive benefits under the "any occupation" standard. Hartford sent letters to Testa on February 2, March 8 and March 29, 2007, explaining that it was continuing to evaluate her claim for benefits, and asking for additional information.

## 1. *Materials Supplied By Testa*

In support of her claim for continuing benefits, Testa submitted a Claimant Questionnaire dated August 19, 2006; a letter report from her neurologist, Dr. Lyzette Velazquez ("Dr. Velazquez"), to Testa's primary care physician, Dr. Salvatore Conte ("Dr. Conte") dated August 17, 2004; an undated letter from Dr. Velazquez to Hartford; an Attending Physician's Statement of Disability from Dr. Velazquez dated September 25, 2006; a Psychiatric Attending Physician's Statement of Disability from her psychotherapist, Linda Taggart, LMSW ("Taggart"), dated November 17, 2006; the results of an April 14, 2004 MRI of her left shoulder; the results of an August 10, 2004 MRI of her brain; and the results of an August 20, 2004 MRI of her cervical spine.

In her Claimant Questionnaire, Testa claimed to suffer from "migraine headaches, irritability, drowsiness, moodiness, anxiety, irrationality; neck, left shoulder, back, right knee, left knee pains[,] cannot function or focus[, and] depression." AR at Hartford 727. She claimed she was experiencing "more pronounced body pains," had suffered a mild stroke, became "stressed over conversation," and could not make decisions on her own. *Id.*

Dr. Velazquez's letter report to Dr. Conte reported that Testa's migraines, which until May 2004 had been under control through use of Fiorinol, were now causing constant pain, "visual orus, phonophopia, photophobia, vomiting, poor sleep, poor appetite, poor concentration and memory problems." *Id.* at Hartford 709. Dr. Velazquez diagnosed Testa with migrainosis, "cervical derangement and radiculopathy to be

4

confirmed with further testing," *id.* at Hartford 711, and two areas of hyperintensity in her brain "likely due to migraines or rule out small strokes." *Id.* at Hartford 709, 711. Dr. Velazquez recommended that Testa remain out of work for four weeks.

Dr. Velazquez stated in her undated letter to Hartford, which appears to have been faxed on March 7, 2005, that Testa "remains symptomatic with severe headaches and depression," *id.* at Hartford 719, and was incapable of returning to work for six months. In that letter, Dr. Velazquez listed Testa's symptoms as "unable to work on stressful situations, engage with customers or co-workers, unable to sit, stand for more than one hr. at the time because of her neck stiffness." *Id.*

Dr. Velazquez's September 2006 Statement of Disability reported that she had been seeing Testa every three months since July 2004; her primary diagnosis was severe migraine headaches and her secondary diagnosis was depression with anxiety; Testa's symptoms included neck pain, nausea and vomiting; and, upon physical examination, Testa's cervical spine was tender and had a limited range of motion.

Taggart's November 2006 Statement of Disability reported that she had been seeing Testa about every two weeks since October 2005. Taggart diagnosed Testa with adjustment disorder with anxiety and depression, which created symptoms such as "memory loss, inability to concentrate, migraine pain, other bodily pain including shoulder, anger, depression, anxiety." *Id.* at Hartford 682. Taggart reported that Testa's concentration, attention, memory impairment and depression might affect her "performance/occupational functioning." *Id.* at Hartford 684. Moreover, Taggart stated

that if Testa's migraines stopped, she would be able to complete all the tasks required by her occupation; but until then, no accommodation or modification at work would help.

Testa's MRI of her left shoulder showed a subacromial impingement; the MRI of her brain showed "tiny foci of hyperintensity," *id.* at Hartford 714, likely due to her history of migraine headaches; and the MRI of her cervical spine showed a "slight reversal of the normal cervical lordosis," "mild central canal stenosis at C5-6" accompanied by "mild compression of the right ventral cord" and "moderate bilateral neural foraminal stenosis," "mild central canal stenosis at C6-7" accompanied by "slight flattening of the ventral cord" and "severe neural foraminal stenosis" with "impingement on the left C6 nerve root and probable impingement on the right C6 nerve root." *Id.* at Hartford 716.

## 2. *Materials Supplied By Hartford*

To help it determine whether Testa was eligible for continuing disability benefits, Hartford had an independent medical services company — Reed Review Services ("RRS") — retain two specialists, Dr. Peter Mosbach, Ph.D. ("Dr. Mosbach") and Dr. Michael Farber ("Dr. Farber"), to review her file, consult with her treating physicians, and render reports. RRS sent Hartford the reports together in letter form, along with a "consensus opinion" written by Dr. Mosbach.

Dr. Mosbach, a psychologist, based his report on Dr. Velazquez's and Taggart's progress notes and Statement of Disability forms, and the MRI reports. Dr. Mosbach stated that "[e]ven though the claimant was described as having problems in attention and concentration and memory, there was no objective evidence of any cognitive

6

or memory impairments in the progress notes." *Id.* at Hartford 590. Further, "[t]here is also no evidence that the claimant's depression and anxiety were severe enough to cause any significant limitations or restrictions." *Id.* at Hartford 591.

Dr. Michael Farber ("Dr. Farber"), an internist, based his report on a discussion with Dr. Velazquez, her progress notes and her 2006 Statement of Disability form. Dr. Farber stated that Testa's migraines worsened in 2004, and that there was objective evidence of some foci of hyperintensity in her brain, some back problems, and calcific tendinopathy in her shoulder. Dr. Farber reported that Dr. Velazquez told him that the "most limiting factor appears to be related to depression affecting headaches and the ability to function," and that Testa's musculoskeletal problems "come and go." *Id.* at Hartford 592. Dr. Farber determined that Testa could "lift, push, pull, and carry weight" up to 15–20 pounds; that her ability to reach and to navigate stairs was limited; and that "there was no objective data to support any long-term cognitive dysfunction due to migraine or inability to sit and perform most motor and fingering activites." *Id.* at Hartford 593–94. Despite those restrictions, he concluded, "she should be able to complete an eight hour day of at least sedentary to light duty with the above modifications." *Id.*

Their consensus opinion stated that Testa "did not manifest any significant functional limitations and restrictions from a psychological perspective," "was capable of sedentary to light duty work," and that there was "no evidence of any limitations or restrictions due to a mental or nervous condition." *Id.* at Hartford 594.

In May 2007, Hartford completed an Assessment of Employability for Testa,

taking into account the opinions of Drs. Mosbach and Farber. According to the assessment, Testa had demonstrated the ability to perform "repetitive or short cycled work," "deal[] with people," "direct[], control[], plan," and "work[] under specific instruction." *Id.* at Hartford 555. Therefore, the report concluded, she was capable of being an internal auditor, an order department supervisor, an auditor, or an office manager.

## C. Termination of Benefits and Internal Appeal

On May 15, 2007 — three months into the period during which the stricter "any occupation" standard applied — Hartford sent Testa a letter explaining that her long term disability benefits would be terminated as of May 16, 2007 because she no longer met the plans' definitions of total disability. The letter summarized the reports by Drs. Mosbach and Farber and the employment assessment, and stated that Dr. Mosbach "noted that the information provided did not support any restrictions/limitations from a mental/nervous condition." *Id.* at Hartford 552. The letter also stated that Dr. Farber "noted there was no data to support any long-term cognitive or motor dysfunction due to migraine headaches or any inability to sit and perform most fine motor and fingering activities." *Id.* Finally, the letter advised Testa that ERISA gave her the right to a full and fair internal appeal, during which Hartford must consider any supplemental materials she submitted to support her claim.

Testa timely appealed Hartford's termination of her benefits and supplemented her claim with updated medical records.

Joye Kelly ("Kelly"), the Appeal Specialist at Hartford who coordinated

Testa's appeal, further supplemented the record by requesting that another independent medical services company — MES Solutions ("MES") — arrange for two specialists to review Testa's file, consult with her treating physicians, and prepare reports.

The first of those doctors, Dr. Leonid L. Topper ("Dr. Topper"), a neurologist, reviewed Testa's full file and rendered a report. Dr. Topper's report was based primarily on notes and Statement of Disability forms by Dr. Velazquez and Taggart, a conversation with Dr. Velazquez, and additional records from, and conversations with, Dr. Conte, Testa's primary care physician; Dr. Daniel Wilen ("Dr. Wilen"), Testa's orthopedist; and Dr. Christopher Tabick ("Dr. Tabick"), her chiropractor. After summarizing his conversations with Testa's doctors, Dr. Topper stated that Testa "does not have clinical evidence of a diagnosable mental condition (such as depression)." *Id.* at Hartford 46. Dr. Topper reasoned that Testa's "self-reported complaints are out of proportion to the clinical findings," and the "clinical findings, from a neurological point of view, do not document any functionally impairing condition." *Id.* at Hartford 50. "Additionally, some behaviors indicative of forgetfulness . . . were observed, but no clinical assessment of her mental status and memory were done. These clinical findings, from a neurological point of view, do not document any functionally impairing condition." *Id.*

Moreover, Dr. Topper saw evidence that Testa was over-medicating her migraines, leading to "Medication Overuse Headaches," which "is treated by introducing a preventive medicine and tapering down the offending medicine." *Id.* Dr. Topper noted that Dr. Velazquez told him that Testa "did not seem to be motivated to attend a headache

9

clinic that she was referred to." *Id.* Dr. Topper concluded that the diagnoses by Drs. Conte and Velazquez were "predominantly based on subjective findings," and that "[c]onsidering the paucity of objective clinical findings, compared to the plethora of complaints, I believe that the claimant might have a somatoform disorder," which Dr. Topper defined as "a subconscious assumption of the role of a sick person."[2] *Id.* at Hartford 51.

Dr. Robert N. Polsky ("Dr. Polsky"), a psychiatrist, based his report on Testa's psychiatric records and a conversation with Testa's new[3] psychotherapist, Joe Cesaro, LCSW ("Cesaro"). After reporting that "multiple 'disability' forms indicate moderate to severe problems with memory, cognition and concentration, but do not contain mental status examination findings which demonstrating [sic] these findings," Dr. Polsky reasoned that "[t]he information presented does not document that [Testa] presents with functional restrictions/limitations as a result of any medical condition that would reasonably be expected to preclude her from performing any work activity on a full-time basis." *Id.* at Hartford 53. Dr. Polsky stated that the "documentation does not indicate that [Testa] is being treated at any higher intensity of psychiatric services than every other week psychotherapy and monthly medication management visits." *Id.* And while her treating physician's describe her "as having moderate to severe problems with memory, cognition and concentration, [] mental status examination findings are not provided that would

---

[2]For example, Dr. Topper stated that Testa believed she had a stroke, but that belief was based only on the 2004 MRI showing multiple foci of hyperactivity, which may have been caused by a small stroke.

[3]Taggart left her job in April 2007.

10

support impairment." *Id.*

On February 12, 2008, Kelly sent Testa a letter upholding Hartford's termination decision. The letter explained that all the evidence was considered, but the appeal was primarily focused on recent medical history and opinions. Kelly stated:

> Review of the records reveals findings on physical/clinical (testing) examinations have provided some findings however the findings do not support the severity of Ms. Testa's self-reported complaints and/or do not correlate with the medical findings of fact. The extent to which the findings on physical/clinical examination document Ms. Testa's inability to perform do not clearly establish Ms. Testa has any medical conditions(s) that would reasonably be expected to keep Ms. Testa from performing any work activity on a full time basis.

*Id.* at Hartford 32. Kelly further stated that forms "completed by Dr. Velazquez and Dr. Conte are almost identical," and found it "questionable as to how Dr. Velazquez (Neurologist) and Dr. Conte (Internal Medicine) came to the same conclusion including comments regarding restrictions/limitations" because "Testa has not had any assessments or formal testing regarding her physical and/or mental/nervous capability to perform any substantial gainful employment." *Id.* at Hartford 33. Kelly concluded that four medical consultants had reviewed the record, each had determined that Testa had the ability to work, and therefore, based on all the evidence, found that Hartford's decision to terminate benefits was "correct and proper." *Id.* at Hartford 35.

## DISCUSSION

### A. Standard of Review

Courts review "a denial of plan benefits 'under a *de novo* standard' unless the

11

plan provides to the contrary." *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). "Where the plan provides to the contrary by granting the administrator or fiduciary discretionary authority to determine eligibility for benefits, trust principles make a deferential standard of review appropriate." *Id.* (internal quotation marks and citation omitted).

Testa argues that the Court should apply a *de novo* standard of review because Hartford bases its discretion not on a plan document, but on an administrative services agreement,[4] and that therefore "Hartford has not been provided with the necessary discretion in appropriate form." Pl.'s Mem. of Law in Supp. at 4. Defendants correctly respond — and Testa's attorney conceded at oral argument — that the plans afford Hartford the requisite discretion.[5] *See* AR at Hartford 809 (basic plan), Marsh 490 (optional plan) ("The Claims Administrator and any reviewing committee have full discretion and authority to determine all claims under the plan."). Thus, the Court will apply the more deferential "arbitrary-and-capricious" standard. *See Durakovic v. Building Service 32 BJ Pension Fund*, 609 F.3d 133, 138 n.2 (2d Cir. 2010) ("In an action under 29 U.S.C. § 1132(a)(1)(B) [as here], the district court conducts arbitrary-and-capricious review of

---

[4]The administrative services agreement is not part of the AR.

[5]To the extent Testa's argument that Hartford does not have discretion is premised on the fact that the plans list CNA Group Life Assurance Company ("CNA") as claims administrator, it is undisputed that Hartford is the successor-in-interest to CNA and "[c]ourts have frequently found that successors-in-interest succeed to any deference granted to the original administrator by the terms of the plan." *Schnur v. CTC Communications, Co.*, No. 05-CV-3297, 2010 WL 1253481, at *10 (S.D.N.Y. Mar. 29, 2010).

ERISA-fund administrators' discretionary decisions.").

Under that standard, a court "may overturn a denial of benefits only if it was without reason, unsupported by substantial evidence or erroneous as a matter of law." *Demirovic v. Building Service 32 B-J Pension Fund*, 467 F.3d 208, 212 (2d Cir. 2006). "This scope of review is narrow; thus, we are not free to substitute our own judgment for that of the insurer as if we were considering the issue of eligibility anew." *Hobson v. Metropolitan Life Ins. Co.*, 574 F.3d 7583-84 (2d Cir. 2009). "[A] district court's review under the arbitrary and capricious standard is limited to the administrative record."[6] *Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir. 1995)

When ruling on a motion for summary judgment, a court "view[s] the evidence in the light most favorable to the non-moving party and ask[s] whether the evidence shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Durakovic*, 609 F.3d at 137 (internal quotation marks and citation omitted). "There is no genuine issue of material fact where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Id.* (internal quotation marks omitted).

---

[6]Testa argues that because deposition testimony "might sometimes be admissible to assist procedural inquiries," *Richard v. Fleet Financial Group Inc.*, 367 F. App'x 230, 233 (2d Cir. 2010) (summary order), the Court should consider Kelly's deposition in determining whether Hartford fulfilled its obligation to provide a full and fair review, including its obligations to explain its denial of Testa's claim and to notify her of supplemental materials she should submit for Hartford to approve her claim. The AR contains sufficient information for the Court to determine whether Hartford fulfilled its obligations; thus, the Court need not consider whether, notwithstanding *Miller*, there are any circumstances where it could consider extra-record evidence.

## B. Application of Arbitrary-and-Capricious Standard

Testa argues that Hartford has a conflict of interest, and that the Court must factor that conflict into its analysis under the arbitrary-and-capricious standard. Testa further argues that even if there were no conflict of interest, Hartford's decision was nonetheless arbitrary and capricious because it was not supported by substantial evidence and because Hartford did not give her claim a full and fair review.

### 1. *Conflict of Interest*

In *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105 (2008), the Supreme Court considered whether an insurance company hired by an employer to both evaluate and pay claims suffered from a conflict of interest, and if so, how courts ought to handle such a conflict when reviewing the insurance company's denial of disability benefits. The Court held that any plan administrator that both evaluates and pays claims operates under a "dual role" conflict of interest. *See id.* at 114–15. If a reviewing court identifies such a conflict, it "must be *weighed as a factor* in determining whether there is an abuse of discretion." *Id.* at 111. (internal quotation marks omitted). The Court explained that courts should give the conflict greater weight where "circumstances suggest a higher likelihood that it affected the benefits decision," for example, where an "insurance company administrator has a history of biased claims administration," *id.* at 117; courts should give the conflict less weight— "perhaps to the vanishing point" — where "the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances . . . ." *Id.*

14

In contrast to the plan at issue in *Glenn*, claims under Testa's plans are evaluated and paid by entirely different entities; MMC pays the full value of allowed claims and is bound by Hartford's evaluations. Nonetheless, Testa argues that employers who fund plans — like MMC — are also conflicted because they have an interest in choosing claim administrators whose evaluations lead to fewer approved claims. While *Glenn* did not reach that issue, some of its language — taken out of context — tends to support Testa's argument: "[T]he employer's own conflict may extend to its selection of an insurance company to administer its plan. An employer choosing an administrator in effect buys insurance for others and consequently (when compared to the marketplace customer who buys for himself), may be interested in an insurance company with low rates than in one with accurate claims processing." 554 U.S. at 114.

This language, however, appears in the context of explaining why an employer's conflict of interest as both the evaluator and payer of claims is not eliminated by the employer's hiring of an insurance company to both evaluate and pay claims; the insurance company suffers from the same conflict, and the Court created "a legal rule that treats insurance company administrators and employers alike in respect to the existence of a conflict[.]" *Id.* at 115. *Glenn* did not hold, therefore, that where, as here, an insurance company evaluates claims and the employer — bound by the insurance company's determinations — pays out all benefits, there is a conflict of interest for the Court to factor into its analysis. *See Cooper v. Hewlett-Packard Co.*, 592 F.3d 645, 652 n.2 (5th Cir. 2009) ("*Glenn* addressed only the standard of review employed when the administrator has a

conflict of interest, i.e. where a plan administrator both evaluates claims for benefits and pays benefits claims.") (internal quotation marks omitted).

Moreover, even if it is deemed that this qualified as a conflict of interest, it would be entitled to very little weight—and perhaps no weight—because by hiring Hartford to administer claims under the plan it offered employees, MMC essentially "wall[ed] off claims administrators from those interested in firm finances." 554 U.S. at 117.

## 2. *Substantial Evidence*

Testa argues that Hartford's termination decision was not supported by substantial evidence because "[r]eliance upon the paid consultant reports, who never treated, evaluated or even examined Testa, but made conclusions based solely upon a review of medical records, is not reliable evidence." Pl.'s Mem. of Law at 27. Testa relies upon *Stup v. UNUM Life Insurance Co.*, 390 F.3d 301 (4th Cir. 2004), though *Stup* involved a plan administrator afflicted with a dual role conflict. *See id.* at 308. ("[A]n administrator operating under a conflict of interest does not act reasonably in denying benefits if faced, on the one hand, with substantial evidence of disability and, on the other, with only tentative and ambiguous evidence that might, or might not, favor denial of benefits."). Thus, *Stup* does not provide much guidance to a court reviewing the determination by a non-dual role conflicted claim administrator.

Hartford and MMC argue that Hartford's determination was not arbitary and capricious because all four medical consultants agreed that the evidence in Testa's medical file did not support her claim that she was unable to work. After reviewing the AR, the

Court agrees that Hartford's termination decision was supported by substantial evidence. All four medical consultants agreed that Testa's complaints were out of proportion to the objective medical evidence, which did not support Testa's physicians' conclusion that she could not work; the medical consultants reviewed all the medical evidence in Testa's file, and three of the four spoke with at least one of Testa's treating physicians on the phone. *Cf. Durakovic*, 609 F.3d at 141 (upholding plan administrator's determination that claimant had physical capacity to engage in further employment despite "multiple medical reports supporting [claimant's] disability, because the administrator's "determination was supported by the reports of two independent doctors").

Moreover, the vocational assessment prepared by Hartford took into account her physical limitations, including her limited ability to climb, lift, push, pull, or carry weight, frequently stand, or navigate stairs. Further, the jobs identified in Hartford's vocational assessment did not require more skill than Testa possessed. *Cf. id.* at 142 (holding that vocational assessment was arbitrary and capricious where claimant only had a background in "unskilled labor," and two of the three jobs identified in the assessment were semi-skilled).

As the Supreme Court has said, "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). Thus, the Court finds that

Hartford's decision was not arbitrary and capricious.

### 3. Full and Fair Review

In addition to requiring that benefits decisions are supported by substantial evidence, ERISA requires that appeals of claims for benefits be afforded a "full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133(2). Testa sets forth the following claimed procedural irregularities as evidence that her claim did not receive a full and fair review on appeal: (a) Hartford did not sufficiently explain what weight, if any, it gave to the opinions of her treating physicians or Social Security's determination that she was disabled; (b) Hartford improperly required objective evidence of her claim; (c) Hartford terminated her claim despite no improvement in her medical condition; and (d) Hartford engaged in a perfunctory and conclusory vocational review.

### a. Treating Physicians and Social Security

Testa argues that even if the four medical consultants' opinions constitute substantial evidence, Hartford did not sufficiently explain why it credited their reports to the exclusion of Social Security's finding and her treating physicians' opinions that she was unable to work. However, Testa correctly concedes that "it is not, *per se*, arbitrary and capricious to rely solely upon the opinions of non-examining physicians." Pl.'s Mem. of Law at 21. And, as explained above, Hartford was "not required to accord special deference to the conclusions of [her] physicians[,]" *Durakovic*, 609 F.3d at 141; nor was Hartford "required to accord special deference to the determination of the Social Security

18

Administration." *Id.* Moreover, Kelly explained in her letter upholding the termination decision why Hartford discredited the opinions of Testa's treating physicians: "[Their] findings do not support the severity of Ms. Testa's self-reported complaints and/or do not correlate with the medical findings of fact." AR at Hartford 32. Hartford reviewed all the evidence—including the Social Security's determination—and accepted four consistent medical consultants' reports rather than the reports from Testa's treating physicians; this did not deny her a full and fair review.[7]

b. *Objective Evidence*

Testa argues that Hartford should not have denied her claim due to a lack of objective medical evidence when the plan's language had no such requirement. Although subjective complaints alone can constitute sufficient evidence of disability, *see Krizek v. CIGNA Group Ins.*, 345 F.3d 91, 102 (2d Cir. 2003), the Second Circuit recently held that "it is not unreasonable for ERISA plan administrators to accord weight to objective evidence that a claimant's medical ailments are debilitating in order to guard against fraudulent or unsupported claims of disability." *Hobson v. Metropolitan Life Insurance Co.*, 574 F.3d 75, 88 (2d Cir. 2009). Thus, Hartford's denial for lack of objective evidence did not deny Testa a

---

[7]Testa also argues that one of the medical consultants—Dr. Topper—was not qualified. Plaintiff supplies evidence outside the AR that Hartford requested that Dr. Topper be removed from a panel of reviewing doctors at RRS. The Court confines its review to the AR when engaging in arbitrary-and-capricious review, however, and the AR reveals that Hartford relied on MES to retain medical consultants and that Dr. Topper, a board certified neurologist, was qualified.

full and fair review.[8]

c. *Termination Without Improvement*

Testa argues that Hartford did not give her a full and fair review because it terminated her benefits "despite no improvement, after previously acknowledging the severity of her impairment." Pl.'s Mem. of Law at 9. Testa relies on *Connors v. Connecticut General Life Insurance, Co.*, 272 F.3d 127 (2d Cir. 2001), which held that a district court engaging in *de novo* review erred by not acknowledging that the claim administrator's termination of benefits—after "almost thirty months" of paying benefits on an "any occupation" standard—was "a reversal in policy preceded by no significant change in [the claimant's] physical condition." *Id.* at 136. However, the Court is reviewing Hartford's decision under an arbitrary-and-capricious standard, not *de novo*. Be that as it may, Hartford terminated Testa's benefits in May 2007—only three months after beginning to pay her benefits under an "any occupation" standard—and its decision was based on the results of its investigation into whether Testa fit that more rigorous standard. Indeed, Testa had notice—on February 2, March 8 and March 29, 2007—that Hartford continued

---

[8]Testa also argues that to the extent Hartford required objective medical evidence, it did not provide adequate notice of that requirement in violation of 29 U.S.C. § 1333(a). "[W]hen a claim for benefits is denied, written notice must provide '[t]he specific reason or reasons for the denial' and '[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary[.]'" *Juliano v. Health Maint. Org. of New Jersey, Inc.*, 221 F.3d 279, 286 (2d Cir. 2000) (quoting 29 C.F.R. § 2560.503-1(f)). Hartford stated several times in its letter advising Testa of its decision to terminate her benefits, however, that the information in her file did not support any restrictions or limitations stemming from a mental or nervous condition.

to evaluate her claim. *Connors* is therefore inapposite because there is no evidence that Hartford reversed policy arbitrarily.

*d. Hartford's Vocational Assessment*

Testa argues that Hartford should have repeated its vocational assessment after Testa supplemented her file on appeal. Testa does not provide any legal support for this argument and, upon review of the AR, the Court is satisfied that Hartford's twenty-two page assessment adequately addresses Testa's physical limitations and her physicians' opinions. Thus, Hartford's failure to supplement its original vocational assessment on appeal did not deny Testa a full and fair review.

## CONCLUSION

Hartford's and MMC's motions are granted in their entirety. Testa's motion is denied.

**SO ORDERED.**

s/ Judge Frederic Block

FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
February 28, 2011